## Case No. 14,638.

UNITED STATES v. BREED et al.

[1 Sumn. 159.] [1]

Circuit Court, D. Massachusetts. May Term, 1832.

CUSTOMS DUTIES — LOAF-SUGAR — CONSTRUCTION OF REVENUE STATUTES.

1. The revenue or tariff act of 1816, c. 107 [3 Stat. 312], lays a duty on "loaf-sugar" of twelve cents per pound. *Held,* that the words "loaf-sugar" must be understood according to their general meaning in trade and commerce, and buying and selling. And if, upon the evidence, it appeared that loaf-sugar meant sugar in loaves, then crushed loaf-sugar was not "loaf-sugar" within the act.

 [Cited in Sutz v. Magone, 153 U. S. 108, 14 Sup. Ct. 779.]
 [Cited in brief in Nurdlinger v. Irvine (Pa. Sup.) 4 Atl. 167.]
 See Bacon v. Bancroft [Case No. 714]; Lee v. Lincoln [Id. 8,195].

2. Rule as to the construction of statutes respecting revenue

 [Cited in Lawrence v. Allen, 7 How. (48 U. S.) 797. U. S. v. Three Tons of Coal, Case No. 16,515; Morrison v. Arthur, Id. 9,842; Nichols v. Beard, 15 Fed. 437.]
 [Cited in brief in Cutler v. Currier, 54 Me. 88.]

3. What is a fraudulent evasion of a duty.

 [Cited in U. S. v. Two Hundred and Fifty Kegs of Nails. 52 Fed. 233; Id., 9 C. C. A. 558, 61 Fed. 413.]

Debt on a duty bond. [Action by the United States against Ebenezer Breed and others.] Plea, tender. Replication, that greater duties were due than the amount tendered; rejoinder and issue thereon. The cause was tried by a jury.

Mr. Dexter, for defendants.
Mr. Dunlap, Dist. Atty.

The latter cited U. S. v. Pennington [Case No. 16,026]; Webst. Dict. "Loaf-sugar"; Parker, Exch. 206; Id. 208; Hardr. 185; 3 Price. 447; Id. 189, 224, 229, 234. The former cited Two Hundred Chests of Tea, 9 Wheat. [22 U. S.] 435; 1 Pick. 368; and Grennell v. Swartwout (Sup. Ct. N. Y. 1831) [unreported].

STORY, Circuit Justice (charging jury). The whole question in this case turns upon the true construction of the tariff and revenue act of 1816, c. 107, as applicable to the facts in evidence. Revenue and duty acts are not in the sense of the law penal acts; and are not therefore to be construed strictly. Nor are they, on the other hand, acts in furtherance of private rights and liberty, or remedial; and therefore to be construed with extraordinary liberality. They are to be construed according to the true import and meaning of their terms; and when the legislative intention is ascertained, that, and that only, is to be our guide in interpreting them. We are not to strain them to reach cases not within their terms, even if we might conjecture, that public policy might have reached those cases; nor, on the other hand, are we to restrain their terms, so as to exclude cases clearly within them, simply because public policy might possibly dictate such an exclusion. The words of the act of 1816, c. 107, as to duties on the article (sugar) now in controversy, are as follows: "On brown sugar, three cents per pound; on white, clayed, or powdered sugar, four cents per pound; on lump-sugar, ten cents per pound; on loaf-sugar and sugar-candy, twelve cents per pound." Here is a description of four different varieties of the article; and if there be any other, not embraced in either of these descriptions, then it falls within the class of non-enumerated articles, and is liable to a duty of fifteen per cent. ad valorem. If it be a non-enumerated article, then the sum tendered is clearly more than the duty, which is payable; and, therefore, the issue ought to be found for the defendant. Whether it be a non-enumerated article, it is not now necessary to decide; nor has it been insisted on at the argument. If it had been necessary to decide, I should, as at present advised, incline to think, though I desire not to give any absolute opinion, that the statute meant, in the actual enumeration, to include all kinds and classes of sugars. And so it has been argued at the bar; and the controversy has been narrowed down to the inquiry, whether this is to be deemed "white, clayed, or powdered sugar," or whether it is to be deemed "loaf-sugar," within the meaning of the act. That the sugars in controversy were, at the time of their importation, in form and appearance, white, clayed, or powdered sugars; that is, that they were white, and clayed, and in powder, is disputed by no one. The whole testimony proves this; and the whole argument admits it. But on the part of the United States, it is contended, that, though this was the form of the sugar at the time of the importation, it was in fact British loaf-sugar, highly refined, and that it had been crushed from the loaves, and then imported by the defendants, not fraudulently, but bona fide, openly and without disguise, having been bought by them in its crushed state. And the argument is, that the change of form does not change the thing; it is still loaf-sugar; and the change of form is a mere evasion of the act.

The question then is, whether, in the sense of the act, the sugar is, or is not loaf-sugar. The act enumerates (as we have seen) four different classes of sugar. It does not speak of them as refined or unrefined, nor refer to any particular quality in either class. Whatever may be the quality of the sugar in either class, whether high or low, of the best or of the worst quality, all pay the same duty. Nor does the act anywhere refer to the origin or country of the sugar. It makes no difference whether it comes from Cuba or Calcutta, from England or from South

[1] [Reported by Charles Sumner, Esq.]

America. The classification is upon other principles; in two, by color and form; in two, by form, or rather by words usually descriptive of form. The first class is "brown sugar," and this duty is equally payable, whether it be raw brown, or refined brown sugar, and the testimony is, that refined sugar is brown until the bleaching process is finished. Here, then, no other designation is given, than by color. I speak now only as to the words of the act, without supposing, that the commercial sense is different from the common import of the words. The next is "white, clayed, or powdered sugar." It is stated in the evidence, that all white sugars are in fact clayed. But that is not material. The word, white, is here apparently used in contradistinction to brown, and we should probably read the clause, white clayed, or white powdered sugar. The latter has reference both to form and color, unless, which will presently be considered, the commercial sense differs from the common import of the terms. The next class is "lump-sugar," which seems to have reference to form, and is contradistinguished from the two former. The last is "loaf-sugar," which seems also to have reference to form, and is something different from brown sugar, white, clayed, or powdered sugar, and lump-sugar. What, then, is the specific difference? It is said, that loaf-sugar is, that sugar which has once been in loaves, however it may be now altered in form; and that, broken up or crushed, it is still loaf-sugar. The argument seems strong; but let us apply it to the evidence, and see how it will then meet the case. It has been stated in the evidence, and not denied, that all white, clayed, or powdered sugars are first put into the form of loaves, and that the process is indispensable to give them that character. Now, if this be true, what becomes of this whole class of sugars. According to the argument, it must pay a duty of twelve cents per pound, and not four cents per pound, because a new change of form will not change the substance of the thing. Again; lump-sugar is, according to the evidence and the specimen in court, in the same conical form as loaf-sugar; why, then, when it is broken up, does it not pay loaf-sugar duty? Why, when not broken up, does it not pay loaf-sugar duty? Plainly, in the latter case, because, though in the same form, it has acquired a commercial name and character different from that called "loaf-sugar," which is adopted by the act of congress. And in the former case, it has neither the name, nor form, nor character. And this leads me to the remark, that, after all, acts of this nature are to be interpreted, not according to the abstract propriety of language, but according to the known usage of trade and business, at home and abroad. If an article has one appellation abroad, and another at home, not with one class of citizens merely, whether merchants, or grocers, or manufacturers, but with the community at large, who are buyers and sellers; doubtless our laws are to be interpreted according to that domestic sense. But, where the foreign name is well known here, and no different appellation exists in domestic use, we must presume, that, in a commercial law, the legislature used the word in the foreign sense. I say nothing, as to what rule ought to prevail, where an article is known by one name among merchants, and by another among manufacturers, or the community at large, in interpreting the legislative meaning in a tariff act. Congress, under such circumstances may, perhaps, be fairly presumed to use it in the more general, or more usual sense, rather than in that, which belongs to a single class of citizens. But this may well be left for decision until the very question arises. I throw out these remarks only with reference to the case cited at the bar from the superior court of New York, a court certainly of great ability and learning.

What, then, is meant by "loaf-sugar," in a commercial sense, by which I mean, not merely among merchants, but among buyers and sellers generally in the domestic trade? Has it any generally received, uniform meaning? If it has, then, that must be presumed to be the meaning adopted by the legislature in the act of 1816. I agree to the law laid down in the case of Two Hundred Chests of Tea, 9 Wheat. [22 U. S.] 435. That case was as fully considered, and as deliberately weighed, as any which ever came before the court. It was there laid down, that, in construing revenue laws, we were to consider the words, not as used in their scientific or technical sense, where things were classified according to their scientific characters and properties, but as used in their known and common commercial sense, in the foreign and domestic trade. Laws of this sort taxed things by their common and usual denominations among the people, and not according to their denominations among naturalists, or botanists, or men of science.

Nor is there any thing extraordinary in congress taking articles according to their colors, or forms, or any other peculiarity. Sometimes the tax is levied upon a thing with reference to the country of its origin; sometimes according to its colors; sometimes according to its predominant component material; sometimes in its raw shape; sometimes in its manufactured shape; and sometimes, with reference merely to its form or mode of manufacture, or the vehicle in which it is. Thus, by this very act of 1816, ale, beer, and porter in bottles pay different duties from that in other vessels. Wines are taxed differently according to their origin, as Madeira, Sherry, Champagne, Burgundy; and differently, in some cases, when imported in bottles or cases, from what they are in other vessels. So raisins in jars and boxes pay a higher duty, than those in casks.

Green teas pay a higher duty than black. The form of a material is also a ground for a discriminating duty. Thus, iron or steel wire of certain descriptions pays a duty of five cents per pound, and wire of a higher number pays nine cents per pound. Iron in bars or bolts, except iron manufactured by rolling, pays forty-five cents per hundred weight; iron in sheets, or rods and hoops, $2.50 per hundred weight; and in bars or bolts, when manufactured by rolling, and in anchors, $1.50 per hundred weight. We see, that here, the form of the material constitutes the discriminating test of the duty. Doubtless in many of these cases the descriptive terms indicate the quality; not as quality, but as being usually found combined with a particular form, or a particular vehicle. It would be absurd to say, that iron did not pay a duty according to its form, as designated in the tariff; and that, if the same quality was imported in bars and bolts, and in sheets, and rods, and hoops, all must pay the same duty. So that, however true it may be, that the substance may be the same, though the form is changed, it does not follow, that the form of the substance may not be the very ground-work of the duty. Here, the duty is not laid merely on sugar, which is the generic name; but a discriminating duty is laid upon sugar of certain colors, in a certain state, or having a particular denomination, or a particular form.

It is true, that a mere change of form will not authorize a party to evade a law, or escape from its penalties. But this is a principle, that requires qualification and examination. If (as was the fact during the late war with England) an American in Canada, intending to import a piece of broadcloth into the United States from that province, should, for the purpose of disguise, put it nominally in the form of a cloak for his personal use, it would not thereby become his mere baggage, and not dutiable. The question would still be, whether the article was designed bona fide and really, or only colorably, for a cloak. If the latter, then it could not escape from duties or forfeiture. If the former, then the size might not be material. The question would be a question of intent and fact. The form would not necessarily exempt it from duties or forfeiture. But if the cloth were bona fide and in reality a cloak, and so designed for use, its size or other peculiarity would not change its character as baggage. But such cases turn upon very different considerations from cases like the present. Here, the article is in a state exactly such as may be dutiable by law, under a particular description. Its form is precisely that indicated by the law. And it is assuming the whole question to say, that the change of form is an evasion of the act, much more, that it is a fraudulent evasion. If the legislature has made the form, or descriptive appellation, the basis of the discriminating duty, then the change of

form to meet the discrimination is no evasion, and no fraud. The act gives the election to the party, and he has a right to make it. He does that, which the law allows, in the very manner and with the very design it allows. Besides, there is no pretence to say, that the present defendants intended any evasion or fraud. The district attorney expressly disclaims any intention to make such a charge; and the whole facts disprove it. The honesty of the transaction is admitted to be beyond all question. To constitute an evasion of a revenue act, which shall be deemed, in point of law, a fraudulent evasion, it is not sufficient, that the party introduces another article perfectly lawful, which defeats the policy contemplated by the act, or which supersedes or diminishes the use of the article taxed by the act. There must be substantially an introduction of the very thing taxed, under a false denomination or cover, with the intent to evade or defraud the act.

I have stated these things the more at large, because the cause is of great magnitude and because it is quite possible that the decision may deprive a very meritorious class of citizens of a protection, which was supposed to be given them by the tariff act of 1816. But this furnishes no ground upon which the court can depart from the plain meaning of the law. It is a misfortune incident to all laws, that they are necessarily imperfect, and from human infirmity fall short of all the intended objects. But in all such cases it is the business of legislation, and not of courts of justice, to correct the evil. We are to administer the laws, and not to make them.

Let us, then, apply the doctrines above stated to the facts of the case. The testimony contains very few discrepancies; and few that have been deemed of much importance at the argument. Upon one point, however, the testimony, as well of the government witnesses, as of those of the defendants, entirely agrees; and that is, that "loaf-sugar" in a commercial sense in the common business of life, in buying and selling, means sugar in loaves. The name doubtless carries, in some degree, an implication of quality, arising from the fact, that quality is usually associated with form; but the designation is primarily derived from, and depends upon the form. All the witnesses, whether merchants, or refiners, or grocers, or confectioners, have spoken pointedly to this fact. All of them say, that the sugar in controversy, in the form, in which it was imported (crushed sugar), is not known as, or even called, "loaf sugar." Whatever may be its quality, it is still not "loaf-sugar," for it wants the form. A contract to buy or sell "loaf-sugar" would not be strictly complied with by a delivery of sugar in this state. It must be in loaves. Now, if this be the posture of the evidence, and it is not questioned, what is the result? The act must,

upon the principles already stated, be interpreted in a commercial sense. And if this be not "loaf-sugar" in that sense, the defence is established, and the United States have failed to sustain their suit. I do not well know, how to put the case in any other form to the jury. The question is, whether, in point of fact, the sugar in controversy is, or is not, loaf-sugar in a commercial sense; and as the jury decide this, the issue is for the defendants or for the plaintiffs.

Verdict for the defendants.