91 U.S. 570
 23 L.Ed. 455
 MEYER ET AL.
v.
ARTHUR.
 October Term, 1875
 
 1
 ERROR to the Circuit Court of the United States for the Southern District of New York.
 
 
 2
 This is a suit to recover import duties alleged to have been unlawfully exacted by the defendant, the collector of the port of New York. The articles on which they were charged were white lead, nitrate of lead, oxide of zinc, and dry and orange maineral, imported after the first day of August, 1872. By the second section of the act to reduce duties on imports, passed June 6, 1872, 17 Stat. 230, it was provided that on and after the first day of August, 1872, only ninety per cent of the duties theretofore imposed should be levied upon certain enumerated articles imported from foreign countries; amongst which were the following, as described in the words of the act:——
 
 
 3
 'All metals not herein otherwise provided for, and all manufactures of metals of which either of them is the component part of chief value, excepting percussion-caps, watches, jewelry, and other articles of ornament;' with a proviso excepting certain kinds of wire-rope, and chains made of steel wire.
 
 
 4
 The following facts appeared in evidence upon the trial.
 
 
 5
 Oxide of zinc is manufactured in European establishments, as follows:——
 
 
 6
 Sheets of zinc ordinarily sold in commerce are placed in retorts. The face of the retort has an opening large enough to admit the sheet. The backs of the retorts are enclosed in a furnace, and the retorts are heated by bituminous coal to a white heat. The action of the heat vaporizes the spelter, which is entirely consumed. The vapor passes out of the mouth of the retort into large pipes, into which currents of air are forced. The vapor combines with the oxygen of the air, and becomes white, snow-like flakes. The current bears these flakes along through the pipes, which terminate in long chambers. At the mouth of the pipes bags are suspended, in which the flakes are caught. No further process is required.
 
 
 7
 The oxide of zinc in suit was manufactured in this way.
 
 
 8
 Nitrate of lead is a chemical combination of lead and nitric acid. Lead previously melted and cooled is placed in a vessel filled with dilute heated nitric acid, and subjected to a slight additional heat. The nitrate of lead is formed in crystals upon the side of the vessel. Its form as a commodity in the market is ordinarily that of a white, opaque crystal.
 
 
 9
 Orange or red lead is made by roasting dry white lead in a furnace, and exposing it to the air which is admitted into the heated receptacle. By this process the white lead loses a portion of its carbonic acid, and absorbs oxygen from the air. Orange or red lead is used by paper-stainers, manufacturers of wall-paper, and for highly-colored cards.
 
 
 10
 White lead is manufactured as follows:——
 
 
 11
 Small earthen pots are partially filled with vinegar or acetic acid. Pig-lead of commerce, cast into round perforated plates technically called buckles, are placed in the pots above the acid, and not in contact with it. The pots thus filled are placed in a chamber upon a layer of spent tan-bark. Alternate layers of pots and tan-bark are filled up to the roof of the chamber: air is introduced into the chamber through flues and natural crevices. The tan contains moisture, becomes heated, and evolves carbonic acid. By chemical action the lead is oxidized by the oxygen of the air, and then, in combination with the carbonic acid, becomes a carbonate of the oxide of lead.
 
 
 12
 The acetic acid does not touch the lead; but its presence facilitates the process of oxidation.
 
 
 13
 In the course of three months the lead has generally become entirely oxidized, of a white color, but retaining its original shape of a buckle. It is then crushed in rollers, any uncorroded pieces of lead having first been separated from it, then ground and dried. Then, if it is to be sold in oil, it is reground with linseed-oil.
 
 
 14
 An analysis of the articles in question gave the following results:——
 
 
 15
 OXIDE OF ZINC.
 
 Zinc....... 79.98
 Oxygen.... .19.67
 Insoluble matter and impurities. .35
 
 16
 ...........---------
 
 
 17
 .......... .100.00
 
 ---------
 
 18
 ORANGE MINERAL.
 
 Lead....... 90.69
 Oxygen, with traces of carbonic
 
 19
 acid ......9.31
 
 
 20
 ...........---------
 
 100.00
 ---------
 
 21
 DRY WHITE LEAD.
 
 Lead....... 80.11
 Oxygen..... 6.19
 Carbonic acid................. 11.39
 Water...... 2.31
 ---------
 100.00
 ---------
 
 22
 WHITE LEAD IN OIL.
 
 Dry white lead
 
 
 *............... 92.92
 Linseed-oil.. 7.08
 ...........---------
 100.00
 ---------
 NITRATE OF LEAD.
 Lead....... 61.90
 Oxygen..... 4.90
 Nitric acid.. 32.35
 Moisture... .74
 Traces of free nitric acid, insoluble matter .11
 ---------
 100.00
 The metals named in the respective analyses are the components of chief value. There is no metallic zinc or metallic lead, in the ordinary sense of these words,—that is, no metallic zinc or metallic lead of commerce, —in either of these articles. The ingredients in each of the articles unite by reason of their chemical affinity. Oxide of zinc has a different specific gravity, density, and color, from metallic zinc. White lead and nitrate of lead have each a different specific gravity, density, and color, from metallic lead.
 The manufacture of orange or red lead and white lead, either dry or in oil, is carried on by the same persons in the same establishment, commencing with the corrosion of the lead, and stopping the manufacture at certain stages according to the product desired.
 Oxide of zinc and white lead are principally used as pigments. Nitrate of lead is used largely in dyeing and in the manufacture of pigments, and as a disinfectant, and for other purposes. It is never ground in oil. Oxide of zinc, white lead, and red lead, are imported both dry and ground in oil. They must be ground in oil before they can be used as paints. The oxide of zinc and the red lead in the invoices in controversy were dry, and the white lead was ground in oil, and were all to be used in the manufacture of or as pigments.
 All the articles in suit are generally dealt in by persons connected with the manufacture and sale of pigments, and they are staples of trade in that line of commerce. Nitrate of lead, however, is principally dealt in by wholesale druggists: metal dealers do not usually deal in any of these articles.
 The method of the manufacture of white lead has been substantially the same for upwards of twenty-five years.
 There being no disputed question of fact in the case, the court informed the jury that the articles in question had been classified in the tariff acts, not with reference to the material of which they were composed, but with reference to the use to which they were destined and for which they were manufactured, and had been classed as paints, and were not, within the true construction and meaning of said acts, manufactures of metal; and directed a verdict for the defendant, which was rendered accordingly. From the judgment on the verdict this writ of error is prosecuted.
 Mr. Edward Hartley for the plaintiff in error.
 The words 'manufactures of metals, of which either of them is the component part of chief value,' describe nothing technically: they are evidently used in their ordinary sense, and not as terms of trade or art. Lottimer v. Smythe, 17 Int. Rev. Rec. 13, 14.
 As to what constitutes a manufactured article. Lawrence v. Allen, 7 How. 793, 794; Corning v. Burden, 15 id. 267 et seq.; 2 Bouv. 101; 2 Barn. & Ald. 345, 350; Schriefer v. Wood, 5 Blatch. 215. The objection that the articles in suit are not metallic in from, and have been converted by oxidation into substances in which the identity of the metal is lost, is immaterial. Refined distinctions in the construction of tariffs have always been discountenanced. Two Hundred Chests of Tea, 9 Wheat. 438; Schriefer v. Wood, supra.
 The declared purpose of the act of 1872, 'to reduce duties on imports,' must be considered in interpreting its provisions. United States v. Fisher, 2 Cr. 358; United States v. Palmer, 3 Wheat. 610.
 Certain exceptions are specified by Congress in the second section of the act, which negative the idea of any other than those directly made. Tinkham v. Tapscott, 17 N. Y. 141; Bend v. Hoyt, 13 Pet. 271-273.
 The intent of the law-makers is the law. A thing within the intention of the makers of a statute is as much within the statute as if it were within the letter. Zouch v. Stowell, Plowden, 366; United States v. Freeman, 3 How. 565; Telegraph Co. v. Eyre, 19 Wall. 427; Atkins v. The Disintegrating Co., 18 id. 301.
 In no tariff-act have the articles in suit been described by reference to their use, but always under their own proper names.
 Mr. Assistant Attorney-General Edwin B. Smith, contra.
 The only question in this case is, whether or not white lead and the other articles imported by the plaintiffs are manufactures of metals, or of which metals are the component part of chief value, within the true meaning of the act of June 6, 1862, and of the tariff of which it is amendatory. It is of no consequence what these substances are, chemically or scientifically, unless they are also classified commercially in the same way as in chemistry or science; for it is, primarily, the commercial language—designation, meaning, and classification—that is adopted in tariff-acts, 'although it may not be scientifically correct.' United States v. One Hundred and Twelve Casks of Sugar, 8 Pet. 279; Elliott v. Swartwout, 10 id. 151; Two Hundred Chests of Tea, 9 Wheat. 438; Curtis v. Martin, 3 How. 109; Lawrence v. Allen, 7 id. 793, 794; United States v. Breed, 1 Sum. 159, 163; United States v. Sanchet, Gilp. 273; Maillard v. Lawrence, 16 How. 261.
 The accomplishment of a result by chemical action is called a process. Corning v. Burden, 15 How. 267.
 In some instances a manufacture may be one kind of process, and in some another. Lawrence v. Allen, 7 How. 793.
 The amount of duty is to be determined by the commercial designation of the goods or articles imported. Lottimer v. Smythe, 17 Int. Rev. Rec. 13; Durden v. Murphy, 18 id. 174; Elliott v. Swartwout, 10 Pet. 137; Riggs v. Frick, Taney, C. J., Rep. 100.
 Metals are elementary mineral substances. As soon as they combine with aught else, they cease to be metals. White lead is not a manufacture of lead within the meaning of the Tariff Act. It is a distinct article, in which the lead of commerce is not present. There is no lead in it. True, it is produced from lead; but it is not a manufacture of that article. The other articles imported by the plaintiffs are still farther removed by chemical processes from their metallic bases. The raw metal under the tariff-laws is pig lead, in form designed for manufacture, and purchased by manufacturers. A manufacture of that metal would be some article wrought up for a specific purpose, in the construction of which, lead, as elementary metal, is a component. That such is the case is evident from the exceptions in the second section of the act. 17 Stat. 232.
 The special exception of the articles in dispute was unnecessary, because they were not included in the general terms to which the exception was made. There was no occasion to except them, if they were not within the commercial sense of the preceding general clause.
 MR. JUSTICE BRADLEY delivered the opinion of the court.
 The plaintiffs contend that white lead, nitrate of lead, oxide of zinc, and dry and orange mineral, are 'manufactures of metals.' Whether they are or not is the question at issue.
 Unless some special usage to the contrary can be shown, the construction relied on by the plaintiffs is clearly wrong.
 When the act speaks of 'manufactures of metals,' it obviously refers to manufactured articles in which metals from a component part. When we speak of manufactures of wood, of leather, or of iron, we refer to articles that have those substances respectively for their component parts, and not to articles in which they have lost their form entirely, and have become the chemical ingredients of new forms. The qualification which is added to the phrase 'manufactures of metals'—namely, 'manufactures of metals of which either of them' (that is, either of the metals) 'is the component part of chief value'—corroborates this view.
 If the plaintiffs could show a different legislative usage, there would be some plausibility in their position. But this they have failed to do. So far as our attention has been called to the usage, it corroborates the view above expressed. For example: in the act of March 2, 1861, to provide for the payment of outstanding treasury-notes, &c., the import-duties to be levied on lead, copper, and zinc, in various forms, are imposed by the eighth section; whilst those on white lead, oxide of zinc, red lead, litharge, &c., are separately provided for in the ninth section. And in the act passed July 14, 1862, for increasing duties, &c., the duties on iron in different forms, and on 'all manufactures of iron,' are provided for in sect. 3, and those on copper and 'manufactures of copper,' and on zinc and lead, in sect. 4; whilst those 'on copperas, green vitriol, or sulphate of iron,' 'on white and red lead,' and 'oxide of zinc,' are provided for in sect. 7; and those on 'litharge' and 'verdigris,' in sect. 5. In none of these cases is there an intimation that the classes of articles named lap on to each other, or that one duty imposed is exceptional to another; and yet, if the position of the plaintiffs is correct, copperas is a manufacture of iron, white and red led and litharge are manufactures of lead, and verdigris is a manufacture of copper.
 The truth is, that, in the nature of things, a metal and its oxide or sulphate are totally distinct and unlike. Any substance subjected to a chemical change by uniting with another substance loses its identity: it becomes a different mineral species. The basis of common clay is the metal aluminium, and the basis of lime is the metal calcium. But no one would think of calling clay and lime metals; nor, if artificially made, would he call them manufactures of metals. They have lost all their metallic qualities. In just the same manner, iron ceases to be iron when it becomes rust, which is oxide of iron; or when it becomes copperas, which is sulphate of iron. None would think of calling blue vitriol copper. So white lead, nitrate of lead, oxide of zinc, and dry or orange mineral, are not metals: they have no metallic qualities. In the poverty of language, they have no distinct names, it is true, as lime and clay and vitriol have; but each is designated by a scientific periphrasis, in which the name of the metal which forms one of its chemical elements is used. This use of the name has probably been one cause of the confusion which has arisen on the subject.
 Judgment affirmed.
 
* This dry white lead gave the following result:—
Lead.................... 80.20
Oxygen................... 6.20
Carbonic acid.......... 11.21
Water.................... 2.30
......................---------
........................ 100.00
......................---------