(C. D. 397)

BALFOUR, GUTHRIE & CO., LTD. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided November 14, 1940)

*John F. Kavanagh* for the plaintiff.
*Charles D. Lawrence*, Acting Assistant Attorney General (*Joseph F. Donohue*, special attorney), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges; EVANS, J., not participating

KEEFE, Judge: In this suit the plaintiff seeks to recover certain customs duties alleged to have been illegally assessed by the collector at New York upon merchandise invoiced as "Palm Oil Oleine Pressed." Duty was assessed thereon at the rate of 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930, as a nonenumerated manufactured article, and in addition thereto a duty of 3 cents per pound was levied under the provisions of the Internal Revenue Act of 1936, section 701 (c)(8).

The plaintiff claims that the merchandise is properly free of duty as a palm oil or a nut oil under paragraph 1732, and alternatively that it is dutiable at 10 per centum ad valorem as a nonenumerated unmanufactured article under paragraph 1558. It is further claimed that the merchandise is not subject to tax under section 701 (c) (8) of the Revenue Act of 1936.

The paragraphs of the Tariff Act of 1930 under consideration provide in part as follows:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1732. Oils, expressed or extracted:   *   *   *   palm   *   *   *   and nut oils not specially provided for.

The Revenue Act of 1932, section 601 (c) (8) as amended by the Revenue Act of 1936, in respect to oils, provides as follows:

SEC. 701.  TAX ON CERTAIN OILS.

The first sentence of section 601 (c) (8) of the Revenue Act of 1932, as amended, is amended to read as follows:

(8) Whale oil (except sperm oil), fish oil (except cod oil, cod-liver oil, and halibut-liver oil), marine-animal oil, tallow, inedible animal oils, inedible animal fats, inedible animal greases, fatty acids derived from any of the foregoing,   *   *   *   whether or not refined, sulphonated, sulphated, hydrogenated, or otherwise processed, 3 cents per pound   *   *   *.

In Treasury abstracts published for the information of collectors of customs and others concerned, T. D. 49161 (8), it is provided in respect to oils as follows:

(8) *Combinations and mixtures containing certain oils.*—Section 601 (c) (8), Revenue Act of 1932, as amended by Section 701, Revenue Act of 1936.

(a) Coconut oil, palm oil, and palm-kernel oil, whether or not refined, sulphonated, sulphated, hydrogenated, or otherwise processed, so long as they are oils of the kinds mentioned, are not subject to import tax under section 601 (c) (8) of the Revenue Act of 1932, as amended. * * *

There were numerous exhibits admitted in evidence upon behalf of the plaintiff. From an examination thereof we find that exhibits 1 and 8, a clear red oil, represent samples from the 105 drums of oil covered by entry 330912. Exhibits 2 and 3, a heavy red oil, opaque in appearance, represent samples from the 188 drums of oil covered by entry 801058. These samples represent the merchandise before us for consideration. Exhibits 5 and 6, an orange-colored substance of the consistency of butter, represent merchandise taken from 146 drums of oil also covered by entry 801058 but returned free of duty as palm oil.

Several witnesses testified upon behalf of the plaintiff, among whom were the traffic manager of the plaintiff, familiar through long experience in handling palm oils; the purchaser of the merchandise who had ordered it from the plaintiff and had dealt in palm oils for many years; a member of the firm of plaintiff who had charge of palm oils from the point of production and of the sales force, and had been buying and selling such oils before the act of 1922 and handling the majority of palm oils imported into the United States; a chemist of long experience who had analyzed from 30 to 50 samples of palm oils including the oils in question and had made a study thereof; and the chief chemist of the New York Produce Exchange since 1917, who had analyzed as many as ten thousand samples of palm oils and who acts as referee in disputes involving palm oils.

From the evidence adduced by these witnesses we find that palm oil is the product of the fleshy fruit of the palm not including the palm kernel; that it is derived from the fruits by expressing or extracting under pressure; that palm oils range in color from a light orange to a very deep red and have a characteristic odor resembling violets; that palm oils originate principally in Africa, South America, and the West Indies, and that there are many varieties of palm oils being discovered constantly in various parts of the world.

The characteristics of palm oils vary according to the place grown, the type of tree, the manner of expressing, and the type of container or tank in which the oils are stored at the point of origin. There are three general grades of palm oils, to wit, the softs, semis, and hards, and these grades depend upon the chemical constituents of the oils.

Palm oils naturally separate into two parts, the lighter or oleine portion, and the heavier stearine portion which settles to the bottom. All palm oils contain oleic acid, palmitic acid, small amounts of linoleic acid, myristic, and stearine. The relative proportion of liquid, which is the oleine portion, is normally about half of the stearine or the mushy or solid portion, but some palm oils vary greatly in these proportions of oleine and stearine. There are palm oils that contain naturally only 5 to 10 per centum stearine and the remainder oleine, while others have over 60 per centum stearine as a natural ingredient. The methods used to separate the liquid from the semisolid are by allowing the oil to settle in a tank at proper temperatures; by chilling and expressing; and by a process of extraction at the time of expressing the oil from the fruits.

Exhibits 1, 2, and 5 were analyzed and show the following range of chemical values:

|  | Specific gravity at 30° C | Palmitic acid-free fatty acids | Saponification No. | Iodine value | Molecular weight | Melting Point |
|---|---|---|---|---|---|---|
| Exhibit 1 | 0. 910 | 0. 82% | 197 | 67. 2 | 281 | 1°C |
| Exhibit 2 | . 910 | (?) | 195 | 71. 4 | 282 | −3°C |
| Exhibit 5 | . 913 | 14. 8% | 197 | 59. 2 | 278 | 38°C |

The testimony relative to the range of the chemical constituents of palm oil establishes that exhibits 1 and 2 come within the range of palm oils as well as that of exhibit 5. The specific gravity is about .910 at 30° centigrade; the free palmitic acid ranges from 0 to 100; the saponification values vary from 193 to 206; the iodine values are from 20 to 88; and as to the melting point, some oils would not freeze at 0° centigrade, while others are not liquid at 53° centigrade according to the evidence submitted. The color of these three exhibits compares with the normal color or range of colors of palm oil. They possess the characteristic odor, and from the foregoing range of chemical values of palm oil the various chemical properties of exhibits 1 and 2 as well as exhibit 5 fall within the limits of palm oil.

The chemical definition of oleine is the glyceride of oleic acid and commercial oleine is the red oil or liquid portion expressed from the fatty acids of animal tallow, but commercially oleine is also known as the liquid portion of all oils. Stearine is a constituent of all oils, chemically defined as the glyceride of stearic acid. In commerce, however, it indicates the more insoluble portion of oil, whether such solid portion is actual stearine or palmitin.

The witnesses were all agreed that the oils in question, as illustrated by exhibits 1, 2, and 5, were palm oils (although defendant's witnesses insisted that exhibits 1 and 2 were destearinated palm oils), and that in exhibits 1 and 2 some of the stearine had been removed but the

exhibits still contained possibly 20 per centum of stearine; that the oils were known in the trade as palm oil and exhibits 1 and 2 were actually palm oils that had been destearinated; that the oils were adaptable for use for all the purposes that palm oil is used and that these oils were actually bought and sold as palm oil and were used for one of the purposes for which palm oil is ordinarily adaptable.

Two chemists from the United States Customs laboratory testified for the defendant that they had analyzed palm oils for their characteristics; that palm oil oleine is the more liquid portion of palm oil which had been separated from the stearine or more solid portion; that the principal characteristic from which palm oil is determined by them is the melting point; that the characteristic by which palm oil oleine is distinguished from palm oil is the melting point; that palm oil oleine also has a higher iodine value and a lower titer test (the solidifying point of fatty acids) than palm oil; that in their opinion palm oil oleine is a product derived from palm oil and that palm oil oleine is destearinated palm oil. In their experience they had each tested 10 or 12 samples of palm oil oleine.

The official samples from which the Government had determined that the merchandise in question was not palm oil were not proven to be samples taken from the shipments in question and consequently were not admitted in evidence.

At the close of the trial it was stipulated and agreed between counsel that the merchandise in question, classified as palm oil oleine, and assessed for duty as a nonenumerated manufactured article, is produced by a process of pressing palm oil derived from palm fruits, thus separating the palm oil into two parts, one containing the major portion of the palm oil stearine and the other containing the greater portion of the palm oil oleine.

The question before us therefore is whether or not palm oil, as taken from the palm fruits, when separated into two parts, one portion containing the more liquid portion of the oil known as the oleine, and the other the more solid portion known as the stearine, is provided for under the *eo nomine* designation in paragraph 1732 for palm oil, or is more specifically provided for as a nonenumerated manufactured article derived or manufactured from palm oil, and, further, whether such article is subject to duty under the Revenue Act of 1936 at 3 cents per pound.

The importer contends that the oil is in fact palm oil and the removal of a portion of the stearine by pressing does not change the name of the product, nor its character or use.

The Government contends that the imported oil derived from the natural palm oil by a process of pressure and extraction differs in materials and composition from the product from which it was

derived and therefore is a derivative of the natural product and properly dutiable as a manufactured article.

From the evidence submitted it is clear that the oil in question consists of palm oil from which the greater part of the stearine has been extracted, or, in other words, it is destearinated palm oil. The Government in contending that such extraction takes the product out of the *eo nomine* provision for palm oil relies upon the case of *Murphy & Co. et al.* v. *United States*, 13 Ct. Cust. Appls. 256, T. D. 41201, wherein. the court stated that parts of an article are not included within an *eo nomine* designation of the article itself. In that case parts of machines for making lace curtains were claimed dutiable under the provision for "embroidery machines, including shuttles for sewing and embroidery machines, lace-making machines, machines for making lace curtains." The court there pointed out that the same paragraph also provided *eo nomine* for other kinds of machines and in so doing also provided for parts thereof, the court stating:

It will be observed that *parts* are provided for in each of the above classes of merchandise except the first, namely, lace-making machines. Here Congress failed to so provide.

The rule governing *eo nomine* designations is aptly stated in the case of *Nootka Packing Co. et al.* v. *United States*, 22 C. C. P. A. 464, T. D. 47464, wherein the dutiable classification of minced razor clam meat in cans was involved. There the court announced the rule as follows:

Where a dutiable provision names an article without terms of limitation all forms of the article are thereby included *unless a contrary legislative intent otherwise appears*. [Italics ours.]

The merchandise there was classified as clams packed in airtight containers. It was claimed free of duty as shellfish, prepared or preserved, not specially provided for. The importers contended that the merchandise was not clams but rather a material obtained from clams. The Government took the opposite view from that taken in the case at bar, claiming that the provision under which classified being an *eo nomine* provision is a more specific description of the merchandise than shellfish, and the court upheld that view.

In the case of *Neuman & Schwiers Co. et al.* v. *United States*, 4 Ct. Cust. Appls. 64, T. D. 33310, certain hams, which had been cured and cooked and from which the bone had been removed, were classified as meats of all kinds, not specifically provided for. The importers claimed that the hams were dutiable under the *eo nomine* provision for "bacon and hams," The court held that the article did not lose its name and character as a ham by reason of the processes undergone and that the *eo nomine* provision for hams was more specific than that for prepared or preserved meats, although parts of the ham had been removed and its condition changed.

In the case of *Schade & Co.* v. *United States*, 5 Ct. Cust. Appls. 465, T. D. 35002, involving the question whether or not frozen wheat, which was not suitable for any purpose except stock feed, was included within the *eo nomine* provision for wheat. In holding that the merchandise was classifiable as wheat the court stated:

\* \* \* The term is used in the tariff law without limitation, and, therefore, the court is bound to hold included therewithin for dutiable classification in the absence of an established trade usage every kind and description of wheat. It is a general term, and the rule long established in tariff interpretation is that where a general term is used in the law without qualification it must, in the absence of a contrary commercial custom, be applied in its broadest significance, including every kind and class of merchandise properly referable thereto, either directly or as a species the genus of which is embraced within the particular tariff nomenclature.

In the case of *Tower & Sons* v. *United States*, 11 Ct. Cust. Appls. 157, T. D. 38948, boiled down cider was held to come within the statutory designation "cider" as against "fruit juices" and "fruit syrups," the court stating:

\* \* \* when the term "cider" was written into the provision without words of limitation it must be assumed that it was intended to include all kinds of cider.

In the case of *Bush* v. *United States*, Abstract 25554, 64 Treas. Dec. 978, distilled oil of lavender, terpeneless, was classified as "all other essential and distilled oils, not specially provided for." It was claimed free of duty as "Oils, distilled or essential: \* \* \* lavender \* \* \*." The court held that the term "terpeneless" as applied to lavender oil simply indicated that certain of the less odoriferous fractions have been eliminated, raising the quality of the lavender oil, and there was nothing to justify the conclusion that lavender oil thus improved is any less lavender oil as provided for under the duty-free paragraph.

The case of *United States* v. *Rockhill & Vietor et al.*, 10 Ct. Cust. Appls. 112, T. D. 38374, involved the classification of small irregular-sized pieces of a white, oily material resembling tallow. The appraiser found the merchandise had been chemically treated and assessed it for duty as a chemical compound. The court of appeals stated:

\* \* \* It does not appear that the oil when thus processed is deprived of the name of the oil by the trade; it is called hardened or hydrogenated oil. Its availability for its former uses is not impaired except of course for such uses as may require it to be fluid at ordinary temperatures.

It was held that the merchandise was erroneously classified as a chemical compound because the essential character and qualities of the oil survived the operation, even though one of its characteristics was modified, and that the oil was not in fact manufactured into a new or different article by means of hydrogenation, but remained oil in trade cognizance for tariff purposes and properly dutiable as fish oil.

In the case of *Bush & Co.* v. *United States*, 11 Ct. Cust. Appls. 246, T. D. 39076, hardened soya bean oil was classified as a chemical

compound. The oil had been chemically modified while heated and under pressure by the addition of two or more atoms of hydrogen induced by the presence of nickel. By the catalytic action of the nickel a part of the oleic acid component of the oil gained for each of its atoms two atoms of hydrogen and was converted into stearic acid. The chemical change added a quantity of stearic acid not found in the original oil and thereby caused the oil to harden at temperatures lower than would otherwise have been the case, but it did not convert the oil into a substance which was not an oil or fat. The court found that the addition of hydrogen into the oil produced a chemical reaction; that the hardened oil became fitted especially for the manufacture of hard soap, a use for which it would not have been available in its liquid form; that the chemical reaction produced an oil having properties not possessed by the original oil, and that it resulted in a chemically compounded oil. Nevertheless it was held classifiable as soyabean oil. See also *Rockhill & Vietor*, Abstract 45788, 43 Treas. Dec. 657.

In the case of *Fuerst* v. *United States*, Abstract 9543 (T. D. 26958), certain merchandise was assessed as cocoa-butterine and claimed free as cocoanut oil under the *eo nomine* provision therefor in paragraph 626 of the act of 1897. The Board of General Appraisers overruled the protest. Upon appeal to the United States Circuit Court (decision reported as T. D. 29394), it found that the article was not simple cocoanut oil but that the oil had been subjected to a process of manufacture and sustained the Board. Upon appeal to the Circuit Court of Appeals, Second Circuit (reported in T. D. 30190), the decisions of the lower courts were reversed. The court stated:

\* \* \* The term "cocoanut oil" in the free list is broad enough to include refined as well as unrefined oil. The merchandise in question is refined cocoanut oil, and consequently it is entitled to free entry unless it is more specifically provided for elsewhere.

In the case of *Proctor Co. et al.* v. *United States*, T. D. 40461, the oil remaining after the pressing of decomposed cod livers at a temperature of from 18° to 20° F., whereby the finer grades of oil adapted for human consumption are thrown off, was held to be cod-liver oil although such oil remains solid at low temperatures and was invoiced as cod-liver oil stearin.

In view of the evidence and a review of the foregoing decisions, we find that the merchandise consists of a crude oil; that it is palm oil which has had the greater portion of the stearine removed and is recognized as a destearinated palm oil; that the merchandise in question was ordered as palm oil and delivery was accepted as a delivery of palm oil; and that it was used for purposes that palm oil is used. That immediately prior to the enactment of the Tariff Act of 1930 such merchandise was sold in the United States as palm oil

and has no other name; that the term "oleine," when applied to palm oil, means merely a soft grade of palm oil, which, nevertheless, contains all of the natural ingredients of palm oil although in different proportions, and is the palm oil of commerce and adaptable to all the uses thereof. Therefore it is entitled to free entry under the provisions of paragraph 1732 as palm oil.

The additional duty of 3 cents per pound under the Revenue Act of 1936, section 701 (c) (8), exacted upon the merchandise in question, is held illegally assessed in view of the wording of the statute, and T. D. 49161 (8). Section 602½ of the Revenue Act of 1934 imposes a processing tax of 3 cents per pound upon the first domestic processing of coconut oil, sesame oil, palm oil, etc. Therefore it is clear that any tax to be collected upon palm oil does not accrue until after importation and does not fall within the jurisdiction of the collector of customs.

For the reasons stated judgment will be rendered in favor of the plaintiff, directing the collector to reliquidate the entries in question and to refund all duties taken.