(C. D. 1805)

Aceto Chemical Co., Inc.
Rohner Gehrig & Co., Inc. } *v.* United States

United States Customs Court, First Division

(Decided September 13, 1956)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Mollie Strum* and *Murray Sklaroff*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: Part of the merchandise involved in this case is invoiced as "Cetyl Alcohol" and the remainder as "Collone SE." All of the importation was classified under paragraph 5 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739, as a chemical compound, and assessed with duty at the rate of 12½ per centum ad valorem. The plaintiffs assert that the cetyl alcohol should be classified under paragraph 52 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as sperm oil, refined or otherwise processed, and assessed with duty at 3½ cents per gallon.

The relevant portions of the Tariff Act of 1930, as amended, *supra*, involved in the consideration of this case are as follows:

Paragraph 5, as modified by T. D. 52739:

| Tariff Act of 1930 para- graph | Description of Products | Rate of Duty |
|---|---|---|
| 5 | All chemical elements, all chemical salts and compounds, all medicinal preparations and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for (except ajinomoto and other monosodium glutamate preparations, ammonium silicofluoride, Haarlem oil, and products chiefly used as assistants in preparing or finishing textiles) | 12½% ad val. |

Paragraph 52, as modified by T. D. 51802:

| Tariff Act of 1930 para- graph | Description of Products | Rate of Duty |
|---|---|---|
| 52 * | Oils, animal and fish:<br>    *       *       *       *       *<br>    Sperm, refined or otherwise processed_____ | * <br> 3½¢ per gal. |

The plaintiffs have abandoned the protest, insofar as collone SE is concerned. We shall, therefore, in this opinion, consider only the protest challenging the classification and assessment of the merchandise invoiced as "Cetyl Alcohol."

The importation under consideration was not only invoiced as "Cetyl Alcohol" (R. 2), but it is referred to throughout the entire record by that name. The processes followed in the manufacture of the cetyl alcohol now before us are outlined in the deposition of Norman Glover of Leeds, England, managing director of the manufacturer of such cetyl alcohol, which was also the exporter of said merchandise to Aceto Chemical Co., Inc.

From Mr. Glover's sworn statement, it appears that the manufacture of cetyl alcohol begins with crude sperm oil. Under normal pressure and at temperatures ranging from 120° to 140° centigrade, concentrated sodium hydroxide is added to, and thoroughly mixed with, the crude sperm oil. At the end of the mixing period, the substance in the "batch" consists of approximately 60 per centum oleic acid and 40 per centum free alcohols. The fatty alcohols derived from the sperm oil are then distilled by superheated steam up to 300° centigrade at normal pressure. The evaporated alcohol is recovered from the steam by condensation. The residue remaining in the still after the alcohol has been subjected to the processes of distillation and condensation is characterized by Mr. Glover as "essentially soap, which is run off and processed for oleic acid." The raw alcohols recovered from the condensed steam are permitted to stand for a time "so as to set." This substance is then put under a hydraulic press which "separates the liquid fatty alcohols from the solid. The solid alcohol which remains in the fatty alcohol is crude cetyl alcohol." The crude alcohol "is neutralized and then redistilled in super heated steam," from which the alcohol in the steam is again recovered by condensation and drying. The article obtained from this final process is described by Mr. Glover as "cetyl alcohol, grade 303 and 308"—the product now under consideration.

After placing Mr. Glover's deposition in the record, the plaintiffs called as their first witness Arnold Frankel, vice president and treasurer of Aceto Chemical Co., Inc., one of the plaintiffs herein. Mr. Frankel holds a Master's degree, and, at the time he testified, had had 5 or 6 years of industrial experience (R. 12). His knowledge of and experience with merchandise of the type here involved covered a period of about half a dozen years.

In substance, Mr. Frankel testified that cetyl alcohol is a "waxy-like material" made by subjecting sperm oil to a process known as saponification; that, by this process, the crude sperm oil, to which is added sodium hydroxide, is broken into two products, "alcohol and a soap-like material"; that, by this process, the sperm oil is "cut in half. One of those halves is cetyl alcohol." The witness admitted there is a difference between a "fatty alcohol and an oil," in that "An oil is a loose, non-technical or semi-technical term that I apply to any material that has an oily feel. An alcohol is a material that has a rigorous, specific chemical definition * * *." Cetyl alcohol does not smell like the raw material from which it is derived, and the original source material cannot be determined by examining the cetyl alcohol. The witness, who said he had bought and sold cetyl alcohol, stated that he had always dealt in the material under the name of cetyl alcohol and had never bought or sold it as "sperm oil," "refined sperm oil," or "processed sperm oil," but gave as his opinion that "Cetyl alcohol is sperm oil that has been processed * * *."

Stuart J. Canter, called as a witness by the plaintiffs, was the owner-director of the Chemical Procurement Co. in New York. While this witness testified that he had obtained a bachelor degree and a master of science degree in organic chemistry from the Polytechnic Institute of Brooklyn and had done some research work for a Ph. D. degree, yet he showed himself somewhat at a loss in the field in which he attempted to testify.

This witness testified that the cetyl alcohol under consideration is, in his opinion, "processed sperm oil," but, when asked for the basis of his opinion, stated: "Because a chemical process has been done on that material," but, on cross-examination, Mr. Canter testified that cetyl alcohol is not processed sperm oil; that it is a new chemical compound that has lost its identity as sperm oil (R. 52–54).

The final witness for the plaintiffs was Seymour Mann, president of the plaintiff corporation. Mr. Mann received a master's degree in chemical engineering from New York University and did some work toward a doctorate, specializing in organic chemistry. His practical experience covered a period of some 5 or 6 years, all of it with the plaintiff corporation, the Aceto Chemical Co., Inc., which he helped to found in 1947. He stated that his company had handled

considerable quantities of cetyl alcohol, amounting in all to between 50,000 and 500,000 pounds. Mr. Mann gave it as his opinion that cetyl alcohol is processed sperm oil. However, his reason seemed to be merely that cetyl alcohol is processed sperm oil, because the raw material from which the cetyl alcohol came by numerous physical and chemical processes is a sperm oil (R. 61–64).

Under cross-examination, the witness gave the following answers:

X Q. Have you ever bought or sold cetyl alcohol as sperm oil?—A. No, it is not sperm oil. It is processed sperm oil.

X Q. Have you ever ordered cetyl alcohol as processed sperm oil?—A. No, I have not.

When asked concerning the uses of cetyl alcohol, the witness stated that it is used in the cosmetic industry but that there is a distinction between that used in the cosmetic industry and a cheaper grade, sometimes used for making soap and detergents. Sperm oil, he explained, is used as a lubricant (R. 72).

The defendant called two witnesses, John D. Hetchler, chemical director of the Chemical Products Division of Archer-Daniels-Midland Co. at Cleveland, Ohio, and Alphonse T. Fiore, manager of the market development group of Givaudan Corp., Delawanna, N. J. Mr. Hetchler holds a bachelor of science degree in chemical engineering from Michigan State College and, at the time he testified, had had approximately 20 years of practical experience with a company which has handled commercially millions of pounds of cetyl alcohol (R. 74–75).

Mr. Hetchler defined cetyl alcohol as "a normal $C_{16}$ carbon chain, fatty alcohol, which has the hydroxyl group on the terminal carbon" (R. 75). He also testified that cetyl alcohol is a fatty alcohol which is a chemical compound; that this alcohol can be made from "sperm oil, tallow, fish oil, and coconut oil"; that the product is never called sperm oil, or processed sperm oil, or bought or sold under any other name than cetyl alcohol; that it is used in detergents, cosmetics, and pharmaceuticals. He described sperm oil as an oil with a "fishy smell" and stated that cetyl alcohol is not an oil, but a chemical compound, which cannot be produced with the same equipment as processed sperm oil.

The witness further testified that, after the processing of crude sperm oil, as explained in the deposition of Mr. Glover, the various products are not sold or known as refined sperm oil, or processed sperm oil, and that the various alcohols are bought and sold as chemical compounds. He testified that he would not accept cetyl alcohol or collone SE for sperm oil, or for refined sperm oil, or for processed sperm oil (R. 90–91).

Mr. Alphonse T. Fiore, defendant's second witness, holds bachelor of science and master of science degrees in organic chemistry from Fordham University. He was also laboratory instructor at that school. He started his employment with the Givaudan Corp. as a research chemist in 1933. That company has been manufacturing cetyl alcohol since 1934 and has sold it in wholesale quantities throughout the United States. At the time of his testimony, the witness held a patent covering a process for the manufacture of cetyl alcohol from palmitic acid (R. 111–113).

This witness corroborated the testimony of Mr. Hetchler by stating that, if the same questions which were propounded to Mr. Hetchler were asked of him, Mr. Fiore, his answers would be the same.

The plaintiffs contend that the facts in the case at bar are such that it is controlled by the decisions in the cases of *United States* v. *Rockhill & Vietor et al.*, 10 Ct. Cust. Appls. 112, T. D. 38374; *Bush & Co. (Inc.)* v. *United States*, 11 Ct. Cust. Appls. 246, T. D. 39076; and *Balfour, Guthrie & Co., Ltd.* v. *United States*, 5 Cust. Ct. 180, C. D. 397. The foregoing cases are, however, clearly distinguishable from the case now under consideration. The *Rockhill & Vietor* case, *supra*, was decided in 1920. According to the facts recited in the opinion of the court—

The merchandise in this case consists of small irregular-sized pieces of a white, oily material which resembles tallow, both in appearance and to the touch. Two shipments were imported and are upon appeal, these having been separately invoiced and entered. In each invoice the merchandise was described as "Hardened oil (fish)"; while in each entry it was described both as "Hardened oil" and as "Fish oil."

The appraiser reported that the merchandise consisted of an unidentifiable oil which had been chemically treated, rendering it hard like ordinary tallow. He returned it for duty as a "chemical compound" not specifically provided for, at 15 per cent ad valorem under paragraph 5, tariff act of 1913.

In their protest, the manufacturers asserted that both shipments of merchandise involved were properly classifiable as free of duty under paragraph 498 of the Tariff Act of 1913 as material commonly used in soapmaking, or, alternatively, as fish oil, at 3 cents per gallon under paragraph 44 of the same act.

Paragraph 5 of the Tariff Act of 1913, under which the merchandise in the *Rockhill & Vietor* case, *supra*, was classified, provided for "Alkalies, alkaloids, and all chemical and medicinal compounds, preparations, mixtures, and salts, and combinations thereof not specially provided for in this section." Paragraph 44 of the same act, insofar as there pertinent, provided for "Oils, rendered: Sod, seal, herring, and other fish oil, not specially provided for in this section, * * *." Paragraph 498 of said act, under which free admission was claimed, provided for "Grease, fats, vegetable tallow and oils (excepting fish

oils) not chemically compounded, such as are commonly used in soap making or in wire drawing, or for stuffing or dressing leather, not specially provided for in this section."

Under the evidence in the *Rockhill & Vietor* case, *supra*, the Board of General Appraisers made the following detailed findings: "(1) that the merchandise was a grease, fat, or oil which was commonly used in soap making, (2) that it was not fish oil, and (3) that it was not chemically compounded." The board, therefore, held the merchandise to be entitled to free entry under paragraph 498 of the Tariff Act of 1913.

In reviewing the testimony, the appellate court came to the following conclusion: That the material before the court was originally either a vegetable or animal oil which was fluid at ordinary temperatures and which "was brought to its present tallow-like consistency by means of the so-called process of hydrogenation." According to the court's summary of the testimony, the oil above referred to—

* * * is first mixed with a finely divided nickel salt or oxide; it is then heated, generally by means of steam, in an atmosphere of hydrogen gas. *The nickel used in the operation does not unite either physically or chemically with the oil, unless in a negligible measure only,* but its presence catalytically facilitates a chemical reaction whereby the oil, which already is composed in part of hydrogen, takes on a slightly increased percentage of that element. The chemical symbol of the oil is accordingly changed by the operation, *not that any new chemical element is added nor that any of the original elements are eliminated,* but simply that the proportion of hydrogen in the processed oil is slightly increased. * * * [Italics supplied.]

As pointed out by the court, this treatment resulted in solidifying the oil at ordinary room temperature and thereby made it possible to—

* * * transport it more economically to this country, and incidentally improves it somewhat physically as a material for soap making. Otherwise the general qualities or characteristics possessed by the oil before treatment do not seem to be affected by the operation. * * * It does not appear that the oil when thus processed is deprived of the name of oil by the trade; it is called hardened or hydrogenated oil. Its availability for its former uses is not impaired except of course for such uses as may require it to be fluid at ordinary temperatures.

The court, therefore, held that the merchandise before it was not properly classifiable as a chemical compound since "the essential character and qualities of the oil survived the operation, even though one of its characteristics was modified. * * * the resultant product was, after all, simply and essentially the oil modified in one of its qualities, * * *."

It seems clear, therefore, from an analysis of the appellate court's decision in the *Rockhill & Vietor* case, *supra*, that the importation was not considered as being processed or refined oil, but the conclusion of the court was that the characteristics of the original oils persisted in

the imported oils which were not new chemical compounds. The oil had not been changed sufficiently to justify any classification other than fish oil, which was the original material with which the treatments involved started.

In the instant case, the importer admits that the merchandise under consideration is a new chemical compound, as established by the following quotations from the record:

JUDGE MOLLISON: Does the plaintiff deny that cetyl alcohol is a chemical compound?

MR. GLAD: No. We say it is more specifically provided for elsewhere. (R. 96.)

Furthermore, the great preponderance of the evidence in the record establishes that, due to the treatment to which the sperm oil was subjected in the instant case, it lost all of its original identity, and the cetyl alcohol under consideration became a definite new chemical compound which was not referred to as oil even on the invoices, where the product was identified as cetyl alcohol, and the evidence shows, without contradiction, that cetyl alcohol is not known in the trade anywhere as an oil or a sperm oil, but only as cetyl alcohol. Not a single witness on either side testified to any knowledge of cetyl alcohol being known commercially as an oil, or being sold as an oil, and every witness, both those called by the plaintiffs and those testifying on behalf of the defendant, admitted that an entirely new chemical compound was created through the processes followed in treating crude sperm oil to the point where cetyl alcohol was produced.

The case of *Bush & Co. (Inc.)* v. *United States, supra,* followed the *Rockhill & Vietor* case, *supra.* In the *Bush* case, *supra,* the finding of the board of appraisers that "the merchandise was not a chemical compound and that it was not chemically compounded" was affirmed by the appellate court.

"The evidence in the case," said the appellate court in the *Bush* case, *supra*:

* * * established without contradiction that the oil in controversy was soyabean oil chemically modified while heated and under pressure by the addition of two or more atoms of hydrogen induced by the presence of nickel. By the catalytic action of the nickel a part of the oleic acid component of the oil gained for each of its atoms two atoms of hydrogen and was converted into stearic acid.

The chemical change thus accomplished added to the oil a quantity of stearic acid not found in the original oil and thereby caused the oil to harden or become solid at a temperature lower than would otherwise have been the case, but *it did not convert the oil into a substance which was not an oil or fat.* From that it follows that the hydrogenation of the oil did not result in a chemical compound and the finding of the board to that effect must therefore be sustained. * * * [Italics supplied.]

In that case, therefore, the court found that the imported oil under consideration was not a chemical compound, but was a chemically compounded oil "which is not so chemically treated as to convert it into a substance which is not an oil or fat." It would seem to follow that an oil which is so chemically treated as to convert it into a substance which is not an oil or fat is a chemical compound. That is exactly the situation in the instant case, according to the great preponderance of the testimony, i. e., the sperm oil was so chemically changed as to convert it into a substance which is not an oil, and, therefore, it is a chemical compound.

The *Balfour, Guthrie & Co.* case, *supra*, was a decision by our own court. After rather an exhaustive review of the decided cases, the court came to the conclusion—

\* \* \* that the merchandise consists of a crude oil; that it is palm oil which has had the greater portion of the stearine removed and is recognized as a destearinated palm oil; that the merchandise in question was ordered as palm oil and delivery was accepted as a delivery of palm oil; and that it was used for purposes that palm oil is used. That immediately prior to the enactment of the Tariff Act of 1930 such merchandise was sold in the United States as palm oil and has no other name; that the term "oleine," when applied to palm oil, means merely a soft grade of palm oil, which, nevertheless, contains all of the natural ingredients of palm oil although in different proportions, and is the palm oil of commerce and adaptable to all the uses thereof. Therefore it is entitled to free entry under the provisions of paragraph 1732 as palm oil.

The facts and conclusions in the *Balfour* case, *supra*, are so obviously different and distinguishable from the case before us that that case is really authority for a conclusion directly opposite to that for which it is cited by the plaintiffs.

We cannot escape the conclusion in this case that cetyl alcohol is not sperm oil, otherwise processed, for the cetyl alcohol before us is not an oil at all, according to the testimony, but an entirely new chemical compound, the oil source of which cannot be determined by an examination of the cetyl alcohol in question. Surely if the well-established rule for the interpretation of tariff laws is followed, and the terms here involved are explained in the language of commerce, there is no merit in the contention that cetyl alcohol is "sperm oil, otherwise processed." As hereinbefore pointed out, there was no testimony whatever produced in court by either party to the effect that cetyl alcohol, manufactured from crude sperm oil, is known commercially as processed sperm oil. On the other hand, the testimony, without variation, establishes that cetyl alcohol is sold as such in all the channels of trade and that most of its uses are different from the uses of crude sperm oil, which is a lubricant.

The plaintiffs have fallen far short of establishing their contention that while cetyl alcohol is a chemical compound, yet that it is more specifically provided for under paragraph 52 of the Tariff Act of 1930, as modified, *supra*, as "Oils * * * Sperm, refined or otherwise processed." Cetyl alcohol is not an oil at all. Not only have plaintiffs failed in their burden to overcome the presumption of correctness of the classification in this case, but their own testimony tends to support the collector's position.

The protest is overruled. Judgment will be entered accordingly.