**WESTERN DAIRY PRODUCTS, INC.**

**v.**

**UNITED STATES.**

**C.D. 4506; Court No. 72-12-02554.**

United States Customs Court.
March 22, 1974.

George Bronz, Washington, D. C. (Edward J. Farrell, Washington, D. C., of counsel), for plaintiff.

Irving Jaffe, Acting Asst. Atty. Gen. (Steven P. Florsheim, New York City, trial attorney), for defendant.

LANDIS, Judge:

This action by plaintiff in this court follows denial of plaintiff's protest filed with the district director of customs complaining the latter's refusal to allow the withdrawal from warehouse of certain merchandise imported from New Zealand into the port of San Francisco described as " 'SAVORTEX' CALCIUM REDUCED DRIED SKIM MILK" (hereinafter CRDSM).

The refusal of customs to release the merchandise for consumption on plaintiff's presentation of a "Warehouse Withdrawal for Consumption" form was due to plaintiff's failure to obtain a duly authorized license from the Secretary of Agriculture. Customs took the position such a license was necessary on the basis that under the Tariff Schedules of the United States (TSUS)[1] CRDSM is classifiable as an article of milk subject to the license requirements proclaimed by the President in a proclamation pursuant to section 22 of the Agricultural Adjustment Act.[2]

Plaintiff filed complaint alleging that the imported CRDSM (used as an ingredient in sausage making) does not require a license from the Secretary of Agriculture because it is classifiable under TSUS not as an article of milk, but as an edible preparation, not specially provided for, dutiable under item 182.95.

_____

1. 19 U.S.C. section 1202.

2. 7 U.S.C. section 624.

Defendant filed answer to the complaint. Defendant's argument virtually concedes that the imported CRDSM is an edible preparation but defendant has denied plaintiff's allegation that the CRDSM does not require a license and further denied plaintiff's allegation that it is classifiable under TSUS not as an article of milk. Issue is, therefore, joined as to whether CRDSM is an article of milk.

Administrative provisions for carrying out the President's proclamation, heretofore referred to, are incorporated in an Appendix to TSUS. Relevant to the pleadings in this case, the TSUS Appendix, part 3, provides in pertinent part as follows:

*Appendix To The Tariff Schedules*

\* \* \* \* \* \* \* \*

Part 3. *Additional Import Restrictions Proclaimed Pursuant To Section 22 Of The Agricultural Adjustment Act, As Amended*

*Part 3 headnotes:*

1. This part covers the provisions proclaimed by the President pursuant to section 22 of the Agricultural Adjustment Act, as amended (7 USC 624), imposing import fees, herein referred to as duties, and quantitative limitations on articles imported into the United States. \* \* \*

\* \* \* \* \* \* \* \*

3. (a) *Dairy products*—

(i) Imported articles subject to the import quotas provided for in items 950.01 through 950.-11, except 950.06, may be entered only by or for the account of a person or firm to whom a license has been issued by or under the authority of the Secretary of Agriculture, and only in accordance with the terms of such license; \* \* \*.

\* \* \* \* \* \* \* \*

Whenever, in any 12-month period beginning . . . January 1 in any year, the respective aggregate quantity specified below for one of the numbered classes of articles has been entered, no article in such class may be entered during the remainder of such period:

\* \* \* \* \* \* \* \*

Dried milk, dried cream, and dried whey provided for in part 4 of schedule 1:

\* \* \* \* \* \* \* \*

950.02 Described in item 115.50 ...          \* \* \*

\* \* \* \* \* \* \* \*

950.11 Malted milk, and articles of milk or cream, provided for in item 118.30, part 4D, schedule 1 ...          \* \* \*

TSUS Appendix items 950.02 and 950.11 cover dairy products classified in TSUS, schedule 1, part 4, in pertinent part as follows:

*Schedule 1.—Animal and Vegetable Products*

Part 4.—Dairy Products; Birds' Eggs

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Subpart A.—Milk and Cream

*Subpart A headnote:*

1. The term *"milk and cream"*, as used in this subpart, includes whole milk, skimmed milk, buttermilk, and cream, except cream described in subpart B of this part.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Dried milk and cream:

\*　\*　\*　　Buttermilk containing not over 6 percent of butterfat ...　　　　\*　\*　\*

Other:

115.50　　　　Containing not over 3 percent of butterfat ...　　　\*　\*　\*

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Subpart D.—Other Milk Products

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

118.30　　Malted milk; and articles not specially provided for, of milk or cream ...　　\*　\*　\*

Plaintiff's claimed item 182.95 is in schedule 1, part 15, subpart B of TSUS which provides, in pertinent part, as follows:

*Schedule 1.—Animal and Vegetable Products*

Part 15.—Other Animal and Vegetable Products

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Subpart B.—Edible Preparations

*Subpart B headnotes:*

1. *This subpart covers preparations fit for human consumption not provided for elsewhere in schedule 1.* [Emphasis added.]

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Edible preparations not specially provided for (including prepared meals individually packaged):

\*　\*　\*　　Of gelatin ...　　　　　\*　\*　\*

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

182.95　　　Other ...　　　　　　\*　\*　\*

The issue in this case, namely, whether CRDSM can be entered for consumption in the United States without a license, is determined by the classification of CRDSM under TSUS. A substantial part of the briefs on both sides is devoted to argument relating to defendant's position that CRDSM is classifiable as the licensed product dried skim milk under item 115.50. However, the question as to the necessity of the issuance of a license in this case, requires the court to decide nothing more than whether CRDSM is an article of milk (subject to license).

Plaintiff concedes that the expression "articles of milk" is intended to classify articles wholly or in chief value of the named material milk.[3] (Plaintiff's brief, page 20.) It matters not, therefore, whether CRDSM is the article of milk specially provided for as dried skim milk dutiable under item 115.50, or an article not specially provided for of milk dutiable under item 118.30, the result being the same, since both such item classifications are subject to license pursuant to Appendix items 950.02 and 950.11, *supra*.[4]

What I proceed to look for and weigh in this record, therefore, in order to determine whether plaintiff can prevail, is proof that CRDSM [concededly an edible preparation] is in the tariff sense an edible preparation not specially provided for as an article wholly or in chief value of the material milk. That proof is necessary because plaintiff's claimed schedule 1 item 182.95 classifies only those edible preparations *not specially provided for elsewhere in schedule 1*. The schedule 1 provision for articles of milk dutiable under item 118.30 quite obviously, in my opinion, includes edible

preparations wholly or in chief value of milk.[5] On the record, as heretofore stated, it is conceded that CRDSM is an edible preparation[6] and I reserve for discussion, on the basis of the record hereinafter summarized, determination of whether CRDSM requires a license as an edible preparation specially provided for as an article of milk.

The proofs consist of a sample of CRDSM and a sample of nonfat dry milk (exhibit 10), used by plaintiff's witness to demonstrate the differences between the two products; printed materials (i. e., documents, patents, booklet and leaflet collectively or individually marked exhibits 1 through 9 and 11 through 14),[7] and testimony of two witnesses, one for each side.

The essence of plaintiff's projected argument is that CRDSM is not classifiable as an article of milk for the simple reason that it contains no milk at all. The facts relevant to that argument are not in dispute and I shall now allude to them.

CRDSM is a patented specially prepared dried powder product which, in the general commerce of the product, is currently used solely as an ingredient in sausage making. It is produced by combining fluid skim milk (which contains relatively more calcium ions than sodium ions) (R. 21) and common salt by an ion exchange process whereby most of the calcium ions present in the fluid milk are replaced by sodium ions in a process which plaintiff's witness testified to as follows:

Q. What are the materials that are used in the manufacture of calcium reduced dried skim milk?—A. The fluid skim milk passes through an

3. TSUS, General Headnotes and Rules of Interpretation, 9(f)(i).

4. The warehouse entry covering the imported CRDSM has not been finally liquidated for duty purposes.

5. See, TSUS item 182.95 footnote reference to TSUS Appendix items 950.22 and 950.23 in part 3, with respect to restrictions on the importation of certain edible preparations except articles provided for by item 118.30.

6. Defendant does not seriously argue that it is not.

7. The exhibits add little that is material to plaintiff's argument that the product is not an article of milk.

ion-exchange resin. For all practical purposes to the eye this looks like, this material looks like grains of sand. But they have a particular property. It has the property of loosely holding to it a sodium ion or a calcium ion, depending on the predominance of the sodium or calcium in the environment.

Now, what happens in the ion-exchange process is first the resin is conditioned by passing through the resin bed a solution of ordinary salt, sodium chloride. This conditions the resin and puts it as we say in the sodium state, that is the sodium from the sodium chloride attaches itself to the resin. Then the salt is washed out of the fluid with water and the resin is said to be conditioned at that point for exchange. Then the fluid skim milk is introduced to the resin bed and as it passes through the resin bed the calcium from the milk attaches itself to the resin and the resin gives off two sodium ions to the milk, which attach themselves to the protein of the milk and converts the casein protein in the milk to sodium caseinate.

The process continues until the resin bed is exhausted of its available sodium ion. And in the vernacular of the trade this is said to be an exhausted resin bed.

Then the process is repeated wherein salt is introduced to the resin bed, it's regenerated, sodium chloride is added back to the resin, and the process continues.

In other words, it's a continuous exchange process, each process having a regeneration step in it. The sodium chloride that's used as a regenerator, of course, never ends up in the final product. It's simply a source of sodium for the regeneration.

Q. Where does the sodium ion come from?—A. Salt, a salt solution.

Q. Are you therefore using up some salt in the process?—A. Oh, yes, that's correct. A regenerant for the resin bed and the resulting compound during the regeneration process is calcium [sic] chloride because the calcium [sic] comes off of the resin and it's replaced by calcium. So, the effluent from the column is a calcium chloride solution which is washed down a sewer.

Q. Just rejected as waste?—A. That's right.

Q. What was the source of the calcium in the calcium chloride?—A. The source of calcium in the calcium chloride was that calcium which originally was present in the fluid skim milk.

Q. In the milk. And that was replaced in the fluid skim milk by what?—A. By a sodium ion from the sodium chloride regenerant.

Q. So would it be fair to say that the product, calcium reduced dried skim milk [CRDSM], is made from two materials which enter into it?—A. Yes.

Q. And those two materials are what?—A. Fluid skim milk and sodium chloride.

Q. And salt?—A. Yes.

Q. Sodium chloride. And the ion exchange process which you described, does that change the molecular structure of the constituent materials?—A. Of what?

Q. Of the constituent materials, of the raw materials?—A. Yes, it does change it.

Q. That change in molecular structure would be described as a chemical change?—A. Yes, and a physical change, yes. [R. 34–37.]

Plaintiff in argument that the CRDSM "contains no milk at all" contends that the above-described process produced "a manufactured product created by a chemical reaction between fluid skim milk and common salt (sodium chloride), which created a new product, with new characteristic properties and new uses, and officially designated by a new descriptive name." (Plaintiff's main brief, page 21.) It is

not necessary in order to resolve this question to discuss all of what plaintiff says about CRDSM as a manufactured product. Admittedly it is a manufactured product.

The underlying stuff of the statement that CRDSM is a manufactured product (relevant to the tariff status of CRDSM as an article wholly or in chief value of milk) is plaintiff's follow-up proposition, relying solely on United States v. Perez, et al., 44 CCPA 35, C.A.D. 633 (1957), wherein plaintiff states that:

> * * * Though skim milk was unquestionably the component material of chief value before the chemical reaction with salt, the material at the time of importation contained as its only component CRDSM, which was produced before importation, and which is not milk. [Plaintiff's main brief, pages 22–23.]

The subsidiary question that thus emerges is whether what plaintiff alludes to as a "chemical reaction" that took place in the ion exchange of calcium and sodium ions changed the milk that went into the process of producing CRDSM into a material that is not milk. That question is quite different from the issue decided in *Perez, supra,* as next discussed.

*Perez* involved flavoring syrup manufactured from a mixture of granulated refined sugar, water, flavoring, coloring and 76 pounds of acid. The sole question was whether the sugar component of chief value in the flavoring syrup, at the time of importation, and as tested by the polariscope was above 75 sugar degrees. The refined sugar that went into the mix tested above 75 sugar degrees but between the time of mixing and the time of importation the sugar underwent a chemical change that changed the sugar to invert sugar testing not above 75 degrees. In the context of that chemical change, *Perez* held that, in the condition imported, the flavoring syrup was in chief value of the material invert sugar as claimed and not the material refined sugar or sucrose as assessed by customs.

The classification issue in this case is quite different from the classification issue posed in *Perez*. *Perez* did not involve generically identifying the material of chief value in the flavoring syrup, which was concededly sugar, but only determining what the sugar tested in terms of polariscope sugar degrees. Decision in this case turns on the identity of the material in CRDSM. It is significant, with respect to that issue, that the chemical change in *Perez* did not change the material sugar into a material of entirely different form that was not classifiable as sugar.

As far back as Meyer et al. v. Arthur, 91 U.S. 570, 23 L.Ed. 455 (1875), it has been recognized that not every "chemical change" or "chemical reaction" in a material changes the material into an entirely different form of material for tariff purposes. While the phraseology utilized in TSUS in describing "articles * * * of milk" is not exactly the same as that utilized in describing the term "manufactures of metal" both those terms classify articles in chief value of material in the tariff sense discussed in Meyer v. Arthur, *supra,* at page 576:

> When the act speaks of "manufactures of metals," it obviously refers to manufactured articles in which metals form a component part. When we speak of manufactures of wood, of leather, or of iron, we refer to articles that have those substances respectively for their component parts, and not to articles in which they have lost their form entirely, and have become the chemical ingredients of new forms. The qualification which is added to the phrase "manufactures of metals"—namely "manufactures of metals of which either of them" (that is, either of the metals) "is the component part of chief value"—corroborates this view.

Pertinent to plaintiff's argument that the exchange of calcium and sodium ions in the fluid skim milk involved a chemical reaction that produced a new material (CRDSM) that contains no milk at all,

the *Meyer* case held that white lead, nitrate of lead, oxide of zinc, and dry and orange mineral are not manufactures in which metals form a component part because:

> The truth is, that, in the nature of things, a metal and its oxide or sulphate are totally distinct and unlike. Any substance subjected to a chemical change by uniting with another substance loses its identity: it becomes a different mineral species. The basis of common clay is the metal aluminum, and the basis of lime is the metal calcium. But no one would think of calling clay and lime metals; nor, if artificially made, would he call them manufactures of metals. They have lost all their metallic qualities. In just the same manner, iron ceases to be iron when it becomes rust, which is oxide of iron; or when it becomes copperas, which is sulphate of iron. None would think of calling blue vitriol copper. So white lead, nitrate of lead, oxide of zinc, and dry or orange mineral, are not metals: they have no metallic qualities. In the poverty of language, they have no distinct names, it is true, as lime and clay and vitriol have; but each is designated by a scientific periphrasis, in which the name of the metal which forms one of its chemical elements is used. This use of the name has probably been one cause of the confusion which has arisen on the subject.[8] [P. 577.]

The Meyer v. Arthur statement that any substance subjected to a chemical change *by uniting with another substance* loses its identity carries the same thought as the court of appeals statement, albeit in a different classification context, that "[a] chemical compound necessarily implies not a mere mingling of components, but a chemical combination of them, resulting in their destruction as distinct entities and in the development by chemical reaction of a new substance possessing properties radically different from those of its constituent elements," United States v. Rockhill & Vietor et al., 10 Ct.Cust.Appls. 112, 113, T.D. 38374 (1920) (holding that a product commonly used in soap making, processed from fish oil in a manner that nickel used in the process catalytically facilitated a chemical reaction whereby the oil, already composed in part of hydrogen, took on a slightly increased percentage of that element, was properly classifiable as fish oil rather than as a chemical compound, as classified and assessed by customs).[9] Closely related to Rockhill & Vietor is Bush & Co. (Inc.) v. United States, 11 Ct.Cust.Appls. 246, T.D. 39076 (1922) (holding that although a soya-bean oil which has been hardened by adding to its hydrogen content is not a chemical compound, but remains the oil it originally was, as held in United States v. Rockhill & Vietor, *supra*; the chemical reaction which produced oil having properties not possessed by the original oil and available for uses for which the original oil was unsuitable, made it a chemically compounded oil in the tariff sense that it was not classifiable under the free entry tariff provision for oils not chemically compounded). For further discussion of

8. See court of appeals comment on the force of this reasoning in connection with a product that lost its physical and chemical identity as seaweed with the result that the product was a new chemical compound different from the material, seaweed. Betz v. United States, 26 CCPA 399, 402, C.A.D. 46 (1939).

9. In support of the holding, the court of appeals stated as follows (pages 115–116):
   * * * It is true that the hydrogenation of the oil modified its chemical formula or symbol by a slight increase in the proportion of its constituent hydrogen, but on the other hand the essential character and qualities of the oil survived the operation, even though one of its characteristics was modified. Hydrogen is undoubtedly a chemical element, but the oil in question although of course composed of chemical elements could hardly itself be called a chemical, and the resultant product was, after all, simply and essentially the oil modified in one of its qualities, and it is far from being ejusdem generis with the substantances which are enumerated in the chemical compound paragraph.

cases and principles see, Balfour, Guthrie & Co., Ltd. v. United States, 5 Cust. Ct. 180, C.D. 397 (1940), which held that a product invoiced as palm oil oleine, pressed (derived by a process of pressing palm oil, which had been expressed or extracted from the fruit of the palm, wherein the palm oil was separated into two parts, one containing the major portion of the palm oil stearine and the other containing the greater portion of the palm oil oleine, the latter containing chemical elements within the range of palm oil) classifiable under the *eo nomine* provision for "Oils, expressed or extracted * * * palm," rather than as a nonenumerated manufactured article as classified by customs. On the other side, compare, Aceto Chemical Co., Inc., et al. v. United States, 37 Cust.Ct. 99, C.D. 1805 (1956), distinguishing Rockhill & Vietor, Bush & Co. *(Inc.)*, and *Balfour, Guthrie, supra,* and holding cetyl alcohol, processed from crude sperm oil chemically treated in a manner that converted the sperm oil into a substance which is not oil, classifiable as a chemical compound rather than a sperm oil, refined or otherwise processed.

The "chemical reaction" to which plaintiff alludes is in fact an ion exchange. Fluid skim milk, in original form, contains substantially more calcium ions than sodium ions. In the ion exchange of calcium ions and sodium ions, the ion proportions are changed so that the resultant material contains substantially more sodium ions than calcium ions.

Analysis of the decisions discussed, *supra,* with respect to materials which have undergone chemical change in the process of producing an imported product, leads me to conclude that the ion exchange process of producing CRDSM did not change the milk material used in the process to an entirely different material. The milk was not united with a substance that chemically caused the milk to lose its identity as milk in the context

discussed in Meyer v. Arthur, *supra;* Betz v. United States, 26 CCPA 399, C. A.D. 46 (1939); [10] or Aceto Chemical Co. v. United States, *supra.* What occurred in the ion exchange of calcium and sodium ions is more akin to what occurred in producing the products discussed in United States v. Rockhill & Vietor, *supra,* Bush & Co. (Inc.) v. United States, *supra,* and Balfour, Guthrie & Co., Ltd. v. United States, *supra.* Since the chemistry of milk in its original form includes calcium and sodium ions, the ion exchange process did not completely change that chemistry, but merely modified it in a manner that the resultant product (CRDSM) remained simply and essentially the milk modified in one of its ions much in the manner discussed in *Rockhill & Vietor.* The resultant product, CRDSM, may well be a different product from the original milk (in the manner of the product discussed in Bush & Co. (Inc.)) but the milk material used in the process of producing CRDSM cannot, in the tariff sense of the classification "articles * * * of milk," be said to have lost its identity. There is not one bit of testimony or other evidence suggesting that a material put through an ion exchange process loses its identity and becomes an entirely different material.

"The major use of ion exchange has been in water softening, in which calcium and magnesium ions, largely responsible for the hardness of water because they form insoluble compounds, are removed by a granular bed of cation exchanger and replaced by sodium ions from the cation exchanger. When the cation exchanger becomes exhausted, by no longer having sufficient amounts of exchangeable sodium left, it is regenerated by passage of an excess of a strong solution of sodium chloride through the bed, thus removing the calcium and magnesium, which are usually discarded." (Encyclopaedia Britannica, Vol. 12 (1970 ed.), p. 497.)

The ion exchange process in water softening is much the same as the ion

10. Cited in note 8.

exchange process that produced the CRDSM described in this record. Since the ion exchange process in water softening does not change the material used in the process into a material that is not water, I deduce that an ion exchange using milk as a material does not change the milk into an entirely different material.

TSUS, and the legislative history of TSUS, offer additional support for the classification of CRDSM as an article of milk. "Whey" and "yogurt" are articles of milk specifically provided for (items 118.00, 118.05, and 118.10), in schedule 1, part 4, subpart D, wherein item 118.-30 provides for all articles not specially provided for, of milk. Whey is the portion that remains after separation from the curd in the process that cheese is made from milk. Yogurt is a fermented milk product. (United States Tariff Commission, Summaries of Trade and Tariff Information (1968), Schedule 1, Vol. 4, pp. 6 and 145.) Both are made from milk that has been modified by a chemical change of sorts. Under the Tariff Act of 1930 whey, which has edible uses for human consumption and nonedible uses (1968 Summary, *supra,* p. 6), was classified under paragraph 1559 (the similitude provision) and yogurt, an edible preparation, under paragraph 1558 as a nonenumerated manufactured article. (Tariff Classification Study, Schedule 1, p. 54.) The specific provisions for "whey" and "yogurt" thus indicate that schedule 1, part 4, subpart D, is intended to classify all articles wholly or in chief value of milk, be they nonedible preparations or edible preparations for human consumption. The history of TSUS further points out that schedule 1, part 4, subpart D, is intended to bring together milk products widely separated in the Tariff Act of 1930 (paragraphs 1559 and 1558), including malted milk and "compounds of milk or cream" dutiable under paragraph 708 of the 1930 Act. (Tariff Classification Study, Schedule 1, p. 54.) Schedule 1, part 15, subpart B, on the other hand, is a "basket" provision for edible preparations not specially provided for, covering products also previously classified under paragraphs 1558 and 1559 of the 1930 Act. (Tariff Classification Study, Schedule 1, p. 251.)

The significance of the discussion on "whey" and "yogurt" is that they are nonedible and edible preparations made from milk that have been chemically changed in much the same fashion as CRDSM, as an edible preparation made from milk which has been chemically changed. It makes no difference that the chemical change that produced whey and yogurt may be considered less, greater or even different from the chemical change that produced CRDSM. The point is that TSUS specifically provides for whey and yogurt as articles (edible preparations) wholly or in chief value of milk that have been chemically modified without losing their identity in those new products. The case decisions and the ion exchange process of water softening, discussed earlier, persuade me that milk put through an ion exchange process is chemically modified but does not lose its identity in the resultant product CRDSM. Since whey and yogurt are chemically modified milk preparations wholly or in chief value of milk, it follows that CRDSM, a chemically modified milk preparation, is an article wholly or in chief value of milk, and I so hold.

Plaintiff having failed to establish that CRDSM is not an article of milk, it necessarily follows it is subject to license provided for in TSUS Appendix, part 3, and this action complaining of the customs decision refusing to release the CRDSM for consumption in the United States without a license is dismissed.

Judgment will enter accordingly.